**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA K. ROTHMAN, *on behalf of* E.D.H., | ) ) | CASE NO. 3:21-CV-01339-JRK |
| Plaintiff, | ) ) | JUDGE JAMES R. KNEPP II |
| v. | ) ) ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) | JENNIFER DOWDELL ARMSTRONG |
| Defendant, | ) ) | **REPORT AND RECOMMENDATION** |

## I.      INTRODUCTION

Plaintiff Donna K. Rothman ("Ms. Rothman") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying the application of her minor daughter, E.D.H, for Supplemental Security Income ("SSI"). (ECF Doc. 1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order No. 2022-14. For the reasons set forth below, I RECOMMEND that the Court OVERRULE Ms. Rothman's assignment of error and AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

On July 24, 2019, Ms. Rothman applied for children's disability benefits on behalf of her minor daughter, E.D.H., alleging a disability onset date of February 15, 2019. (Tr. 132-37).[1] The application was denied initially on November 18, 2019, and upon reconsideration on January 29, 2020, and Ms. Rothman requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 72-75, 80-82). On August 5, 2020, an ALJ held a hearing, during which Ms. Rothman, represented by counsel, testified. (Tr. 34-52). On August 31, 2020, the ALJ issued a written decision finding E.D.H. was not disabled. (Tr. 12-29). The ALJ's decision became final on May 7, 2021, when the Appeals Council declined further review. (Tr. 1-3). On July 12, 2021, Ms. Rothman filed a Complaint challenging the Commissioner's final decision. (ECF Doc. 1). The parties completed briefing in the case. (ECF Docs. 10, 13, 14). Ms. Rothman asserts the following single assignment of error:

> 1. The ALJ's functional equivalence determination was unsupported by substantial evidence because he failed to properly evaluate the opinion of Manikum Moodley, M.D.

(ECF Doc. 10, PageID#930).

## III.     BACKGROUND INFORMATION

### A.  **Personal, Educational, and Vocational Evidence**

E.D.H. was born in 2005. (Tr. 55). Under Social Security Regulations, E.D.H. was an adolescent on the date the application was filed, and was still an adolescent at the time of the ALJ'S decision. (Tr. 16). She has not worked since July 24, 2019, the application date. (*Id.*).

---

[1] The Transcript of the Proceedings before the Social Security Administration for this proceeding is filed as ECF Doc. 7 on CM/ECF.

### B.  **Relevant Hearing Testimony - Ms. Rothman's Testimony**

Ms. Rothman testified that E.D.H.'s postural orthostatic tachycardia syndrome ("POTS") causes her to sleep approximately 16 hours per day and experience bad migraines. (Tr. 38-39). E.D.H., according to Ms. Rothman, will also experience lightheadedness throughout the day, as well as high blood pressure and heart rate. (Tr. 39-40). She showers twice per week, and she recently fell in the shower. (Tr. 40). E.D.H. falls daily and occasionally hurts herself. (Tr. 41). Ms. Rothman testified that E.D.H. is very forgetful and will occasionally forget to turn off the stove, take medication, login for schoolwork, or bring the dog inside. (Tr. 42-43). She also stated that E.D.H. has difficulty remembering and concentrating on her schoolwork. (Tr. 44-45). E.D.H. had to repeat the eighth grade due to poor grades, and Ms. Rothman testified that E.D.H. does not socialize with any friends or classmates. (Tr. 45, 48).

### C.  **Relevant Medical/Non-Medical Opinion Evidence**

#### 1. *Manikum Moodley, M.D.*

Dr. Moodley opined that E.D.H.'s POTS symptoms were caused by an imbalance of the autonomic nervous system's control over blood flow. (Tr. 575). He explained symptoms of POTS may include "palpitations, fatigue, lightheadedness, exercise and temperature intolerance, nausea, headache, difficulty with concentration and focus, syncope and near syncope." (*Id.*). He further stated that these symptoms can be severe enough to affect daily functioning. (*Id.*). He explained that the severity of the symptoms can vary day to day. (*Id.*). He stated that E.D.H. "may require extended time for assignments related to the symptoms of difficulty with concentration, focus and lightheadedness." (*Id.*). He recommended that if E.D.H. experienced an episode, she should drink at least 500 milliliters of water and eat a salty snack. (*Id.*). He also indicated that E.D.H. should have access to the restroom as needed to compensate for increased water consumption, and she

should not participate in vigorous physical educational activities until she had been episode-free for at least three months. (*Id.*).

### 2. *Thomas Evans, Ph.D.*

On September 19, 2019, E.D.H. presented to Thomas M. Evans, Ph.D., for a consultative psychological examination (Tr. 577-79). Ms. Rothman reported that E.D.H. had begun experiencing symptoms of depression two years prior to the examination, and these symptoms included depressed mood, crying, low self-worth, and thoughts of suicide. (Tr. 578). Ms. Rothman also reported E.D.H.'s anxiety symptoms included shortness of breath, racing heart, chest tightness, sweaty palms, racing thoughts, and a feeling that "everyone is against me." (Tr. 588). Ms. Rothman also reported possible agoraphobia, noting E.D.H. could not go to places by herself. (*Id.*). At the time of the examination, E.D.H. had not been taking any psychotropic medications, and she had not yet started counseling. (*Id.*). Dr. Evans observed that E.D.H. maintained good attention and concentration, appeared her stated age, and was cooperative and friendly throughout the entire evaluation. (*Id.*). He noted that E.D.H. had never been diagnosed with ADHD, and that no signs of the disorder were observed; E.D.H.'s mother "did not describe [E.D.H.] as such"; and E.D.H. maintained good attention and focus throughout the entire evaluation. (Tr. 579). Dr. Evans did not assess any limitation regarding E.D.H.'s abilities in attending to and completing tasks relative to the functioning of typically-developing children of the same age. (*See id.*). Dr. Evans did assess, however, that E.D.H. met the criteria for a diagnosis of moderate persistent depressive disorder with anxious distress. (*Id.*).

### 3. *State Agency Psychologists – Bruce Mirvis, M.D. and Robert Klinger, M.D.*

Dr. Bruce Mirvis reviewed E.D.H.'s medical record and found she had less than marked limitations in her abilities to interact and relate with others; move about and manipulate objects;

care for herself; and health and physical well-being. (Tr. 58-59). Dr. Mirvis also found E.D.H. had

no limitations in the remaining functional areas. (*Id.*). Dr. Robert Klinger affirmed these findings,

with the exception that he found E.D.H. had a marked limitation in her ability to care for herself

due to her daily suicidal thoughts, mood swings, and isolation. (Tr. 65-66).

### D.  <u>Relevant Medical Evidence</u>

In this proceeding, Ms. Rothman primarily challenges the ALJ's findings with respect to

E.D.H.'s attending and completing tasks domain. The ALJ summarized E.D.H.'s health records

and symptoms related to these issues as follows:

> The medical evidence shows that a pediatric cardiologist evaluated the claimant in
> February of 2019, around the alleged disability onset date (1F/1). The claimant
> reported worsening episodes of dizziness and headaches since March of 2018,
> usually associated with postural changes and movement, and an increased heart
> rate. She also described chest pain. However, she denied having syncopal episodes.
> She indicated she was not drinking much water, but she was drinking three or four
> cans of caffeinated soda per day. (*Id.*). She reported no weight loss at that time, but
> occasional nausea (*Id.*, at 2). The claimant had musculoskeletal chest tenderness
> upon examination, but her other objective findings were generally normal (*Id.*, at
> 2-3). She was noted to have a positional response of exaggerated increase in heart
> rate in the context of dysautonomia. Her symptoms were determined to be non-
> cardiac in nature, and she was advised to increase her hydration and avoid
> caffeinated beverages (*Id.*, at 3).
>
> A pediatric neurologist also evaluated the claimant in February of 2019 (1F/8). The
> claimant reported constant headaches, along with "multiple diverse symptoms"
> including frequent chest pain, constant nausea, random ringing in the ears, electric
> shock-like sensations in the chest, and foot pain when attempting to bear weight
> (*Id.*, at 11). Upon examination, she had full strength in her upper and lower
> extremities, intact sensation, normal reflexes, a negative Romberg test for balance
> problems, no dysmetria or dysdiadochokinesia, normal ocular findings, a normal
> gait, and no difficulty tandem walking or heel and toe walking (*Id.*, at 10). The
> specialist concluded that her neurological examination was entirely normal and
> non-focal (*Id.*, at 11). The claimant's symptoms were attributed to postural
> tachycardia. She was advised to drink more fluids but avoid caffeinated beverages,
> increase her salt intake, and use caution when changing positions. (*Id.*). The
> claimant sought emergency hospital treatment in April of 2019 for worsening
> symptoms, but she reported she was not drinking as much as she had been directed,

and she had a soda, which she had been told to avoid (2F/82). Her symptoms were attributed to POTS and anxiety (*Id.*, at 84). Her clinical findings remained normal upon a follow-up visit with her neurologist (*Id.*, at 75). She was prescribed compression stockings, and the lifestyle modifications that had been recommended previously were reiterated (*Id.*).

The claimant continued to describe heart palpitations and chest pressure at her cardiology appointments (1F/37). She indicated she could walk or engage in other physical activity for about 15 minutes before having to stop and rest due to dizziness, fatigue and shortness of breath, but she denied having syncope, edema or cyanosis (*Id.*). Electrocardiograms performed on February 5, April 5 and July 9, 2019, were normal; however, on July 30, 2019, her electrocardiogram showed sinus bradycardia (*Id.*, at 40). An echocardiogram on April 16, 2019, was normal. Ambulatory monitoring conducted in May of 2019 indicated generally sinus rhythm, but with ectopic atrial rhythm and rare isolated tachycardia. During an exercise stress test in July of 2019, the claimant reported a rapid heart rate, shortness of breath and chest pain of 8 on a scale of 10, yet the test showed a normal heart rate and normal blood pressure response to maximal exercise. (*Id.*). (*See also* 2F). Her treatment provider indicated no cardiac medications or further follow-up cardiology appointments were necessary (1F/40).

Tilt-table testing performed on June 26, 2019, was abnormal due to prominent tachycardia (2F/156). The findings were nonspecific, but were consistent with POTS, as well as anxiety and other hyperadrenergic states. There was no evidence of a significant cardiovagal or cardiovascular adrenergic abnormality on the autonomic cardiovascular reflex tests, nor evidence of orthostatic hypotension. (*Id.*). Testing for Von Willebrand's disease was negative (*Id.*, at 167). A quantitative sudomotor axon reflex test (QSART) showed reduced values in the left forearm, attributed to the claimant's history of a ganglion cyst, but was otherwise normal (*Id.*, at 158).

Upon a return visit to her neurologist in July of 2019, the claimant continued to report orthostatic lightheadedness, but no syncope or blackouts (1F/25). Her neurological findings remained normal, but orthostatic readings showed marked orthostatic tachycardia (*Id.*, at 28). Based upon this finding, the above testing and her reported symptoms, the claimant was diagnosed with POTS. She was prescribed Florinef, Thermo tablets and vitamin and mineral supplements, and she was advised to drink more water and to exercise. (*Id.*). As of August of 2019, the claimant reported she had increased her fluid intake to 92 ounces per day and was wearing compression stockings except on hot days, but she continued to have dizziness and [un]steadiness (*Id.*, at 50). However, she denied having actual syncope or any falls at that time (*Id.*, at 50, 55). She reported leg weakness and falling in September of 2019, in the setting of a viral illness, which her doctor indicated could increase her

POTS symptoms (7F/14, 15). The claimant also reported feeling hot all the time, and she was prescribed a cooling vest (*Id.*, at 15). Despite her ongoing symptoms, she reported she was still drinking a can of caffeinated soda every day as of October of 2019 (5F/10).

The claimant has continued to see her neurologist in 2020 (10F). Upon an examination in February, she reported being dyspneic, but she looked well and very comfortable (*Id.*, at 7). Her orthostatic vitals showed significant orthostatic tachycardia, but she continued to have normal neurologic findings, including her muscle strength and tone, sensation, reflexes, gait, and Romberg test for balance issues. She had random torso jerking that was pointed out by her mother, which the neurologist indicated did not look like any type of seizure activity. (*Id.*). She was prescribed Adderall, as discussed in more detail below, and a bed wedge (*Id.*, at 8). The claimant received emergency hospital treatment in August of 2020 for dizziness, chest pain, anxiety, and POTS symptoms (8F).

Turning to the claimant's mental impairments, the record shows she was diagnosed with a generalized anxiety disorder in April of 2019, shortly after the alleged disability onset date (2F/80). In August of that year, she reported having heart palpitations and dyspnea when she is anxious; her mother indicated she was just starting counseling, but the record does not show she did so until October 28, 2019 (1F/50; 4F; 5F). Upon a psychological evaluation at that time, the claimant described multiple symptoms of depression and anxiety (5F/9). She reported having suicidal thoughts and a plan, but no intent, and hallucinations of shadows and hearing her name called (*Id.*, at 13). She had a depressed, sad mood and affect, cooperative but anxious behavior, and slowed psychomotor activity (*Id.*, at 12, 13). However, her appearance, thought process, intellectual functioning, orientation, memory, insight and judgment were normal (*Id.*). She was diagnosed with agoraphobia, a major depressive disorder and a panic disorder (*Id.*, at 15). She began receiving psychotherapy (*Id.*). The claimant was prescribed Zoloft, but she reported it was not helpful, and she indicated it was making her tired (9F/8). However, her objective findings were essentially normal upon a mental status examination in February of 2020, including relaxed behavior, a normal mood and affect, and normal memory (*Id.*, at 13-15). She no longer reported suicidal thoughts or hallucinations (*Id.*, at 14). This tends to show improvement in her symptoms with treatment and medication use.

As noted above, in late February of 2020, the claimant was prescribed Adderall for "brain fog" by her neurologist (10F/8). Her mother told the neurologist that her mental health treatment provider, a certified nurse practitioner, wanted a letter stating that the claimant needed a stimulant medication (*Id.*, at 6). The neurologist indicated he had not received any report of a formal psychological diagnoses, but as the claimant was being treated with Zoloft and was in counseling, and as her

anxiety and depression symptoms were active and ongoing, he was willing to prescribe Adderall (*Id.*, at 7, 8). Her mother then reported to the claimant's mental health treatment provider that the neurologist had prescribed Adderall for concentration difficulties (9F/19, 28). There is no evidence that the mental health treatment provider had suggested this medication or requested such a letter from the neurologist (9F). The claimant has not been diagnosed with a condition such as attention deficit disorder (ADD) or attention deficit hyperactivity disorder (ADHD), and no treatment provider or examining physician has observed that she has objective signs of attention or concentration problems.

At a visit with her mental health treatment provider in March of 2020, the claimant described her mood as "in the middle," and she indicated her grades were good, but it took her longer to complete her assignments (9F/19). Her objective findings remained normal at that time and as of April of 2020, including her memory (*Id.*, at 24-26, 36-37). Her mother reported improvement in the claimant's symptoms with Zoloft and Adderall, and indicated she is "moody" three or four times per week, but not every day (*Id.*, at 30).

The evidence of record further indicates that the claimant attended school in person from kindergarten until the third grade (1F/10). She reported she was bullied at that time, and she was then taken out of school and was home schooled until she began ninth grade in the fall of 2019 (Id., at 9, 10). The claimant attained A and B grades during the 2018-2019 school year (Id., at 50). She qualified for an Individualized Education Program (IEP) for the 2019-2020 school year on the basis of a physical impairment (6F). At the direction of her neurologist, she was provided with accommodations in the regular education setting, including snack breaks, a permanent restroom pass, access to fluids, reduced periods of standing, a "buddy" while traveling in the halls, and extra time on tests to allow for drinks and restroom breaks (*Id.*, at 3, 4, 5). The claimant transferred to online classes in October of 2019 (6F/20; 10F/7; testimony). Her school records indicate she received B through D grades during the 2019 school year (10E).

(Tr. 21-24).

## IV.    THE ALJ'S DECISION

As is relevant here, the ALJ issued the following findings of fact and narrative analysis:[2]

> 1. The claimant was born [in January 2005]. Therefore, she was an adolescent on July 24, 2019, the date application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

---

[2] The ALJ's findings are summarized.

2. The claimant has not engaged in substantial gainful activity since July 24, 2019, the application date (20 CFR 416.924(b) and 416.971 *et seq*.).

3. The claimant has the following severe impairments: postural orthostatic tachycardia syndrome (POTS) / tachycardia; generalized anxiety disorder / agoraphobia / panic disorder; persistent depressive disorder, with anxious distress, moderate (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

…

Based on the requirements of 20 CFR 416.924a(a) and SSR 09-2p, the undersigned has considered all of the relevant evidence in the case record. "All of the relevant evidence" includes objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; the claimant's statements (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all settings (i.e., at home, at school, and in the community).

> The undersigned finds that the claimant has:
> • <u>less than a marked</u> limitation in acquiring and using information;
> • <u>no</u> limitation in attending and completing tasks;
> • <u>less than a marked</u> limitation in interacting and relating with others;
> • <u>less than a marked</u> limitation in moving about and manipulating objects;
> • <u>a marked</u> limitation in the ability to care for himself/herself; and
> • <u>less than a marked</u> limitation in health and physical well-being.

…

6. The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since July 24, 2019, the date the application was filed (20 CFR 416.924(a)).

(Tr. 16-28).

## V.      LAW AND ANALYSIS

### A.  <u>**Standard of Review**</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201. Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal

in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The relevant six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

## C. <u>Child Functional-Equivalency Framework</u>

"A child who applies for supplemental security income is 'disabled' if the child is not engaged in substantial gainful activity and has a medically determinable physical or mental impairment or combination of impairments that results in 'marked and severe functional limitations.'" Soc. Sec. Ruling 09-03p, 2009 WL 396025, at *1 (Feb. 17, 2009) (quoting 20 C.F.R. § 416.906). The Commissioner will assess how a child-claimant can "function in [their] activities in terms of six domains," which "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). A "[the child-claimant's] impairment(s) is of listing-level severity if [they] have 'marked' limitations in [at least] two of the [six] domains in paragraph (b)(1) …, or [at least one] 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(d). The Commissioner "will consider [the child-claimant's] functional limitations resulting from all of [their] impairments, including the [impairments'] interactive and cumulative effects." 20 C.F.R. § 416.926a(e)(1)(i). The Commissioner "will consider all the relevant information in [the child claimant's] case record that helps [the Commissioner] determine [the child-claimant's] functioning, including [their] signs, symptoms, and laboratory findings, the descriptions [the

Commissioner] ha[s] about [the child-claimant's] functioning from [their] parents, teachers, and other people who know [the child-claimant], and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929." 20 C.F.R. § 416.926a(e)(1)(i). The child-claimant must prove that they are disabled. 20 C.F.R. § 416.912(a).

A *marked limitation* "interferes seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A child claimant's "day-to-day functioning may be seriously limited when [their] impairment(s) limits only one activity or when the interactive and cumulative effects of [their] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).

An *extreme limitation* "interferes very seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). This may be so even though their "impairment(s) limits only one activity or when the interactive and cumulative effects of [the child-claimant's] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(3)(i). "'Extreme' limitation also means a limitation that is 'more than marked.'" 20 C.F.R. § 416.926a(e)(3)(i). An extreme-limitation rating is the most severe, and it is reserved for "the worst limitations." 20 C.F.R. § 416.926a(e)(3)(i). But it "does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(3)(i).

### D.  Parsing the Record ("Picking and Choosing")

The regulations compel an ALJ to "consider all evidence available in [an] individual's case record." 42 U.S.C. § 423(d)(5)(B). But,

> an ALJ may not selectively include only those portions of the medical evidence that places a claimant in a capable light, and fail to acknowledge evidence that potentially supports a finding of disability. Courts have not hesitated to remand under such circumstances. *See, e.g.*, *Gentry* [*v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014)] (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson* [*v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008)] (finding error where the ALJ was "selective in parsing the various medical reports"); *see also Williams v. Colvin*, 2017 WL 1319781 at * 16 (N.D Ohio Feb. 1, 2017), *report and recommendation adopted by*, 2017 WL 1304475 (N.D. Ohio April 7, 2017); *Ackles v. Colvin*, 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015), *report and recommendation adopted by*, 2015 WL 2142396 (S.D. Ohio May 6, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light.") … *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherrypicking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.["]).

*Davidson v. Berryhill*, No. 16-cv-2621, 2017 WL 4682343, at *17 (N.D. Ohio Oct. 18, 2017).

At the same time, "it is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make 'explicit credibility findings' as to each bit of conflicting testimony, so long as his factual findings as a whole show that he 'implicitly resolve[d]' such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006); *accord Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Notably, there is a difference "between what an ALJ must consider and what an ALJ must discuss in a written opinion." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (endorsing the Third Circuit's analysis in *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00–1995 (3d Cir. Dec. 19, 2000)

14

("[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record."). Further, "'an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) (quoting *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). Similarly, the Sixth Circuit has noted that cherry-picking arguments can "cut[] both ways," as they may turn on whether the ALJ's decision falls within his "zone of choice" under substantial evidence review. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009). Indeed, what plaintiff-appellants have called cherry-picking "can [at times] be described more neutrally as weighing the evidence," and the claimant bears the burden of persuading the court "that the ALJ erred in conducting this difficult task." *Id.* at 284.

### E. Whether the ALJ's Determination that E.D.H. Has No Limitation in Attending and Completing Tasks is Supported by Substantial Evidence

#### 1. *Parties' Arguments*

##### a. Ms. Rothman's Arguments

Ms. Rothman contends that the ALJ failed to properly evaluate the opinion evidence of Dr. Moodley, rendering the ALJ's functional equivalence analysis unsupported by substantial evidence. (ECF Doc. 10, PageID#936). Specifically, she argues that Dr. Moodley opined that E.D.H. may require extended time for assignments related to POTS symptoms of difficulty with concentration, focus, and lightheadedness. (*Id.* (citing Tr. 575)). This limitation and other evidence in the record, Ms. Rothman asserts, indicated that E.D.H. has a marked limitation in the domain of attending and completing tasks. (*Id.* at 936-37). In concluding that E.D.H. was not shown to be significantly limited in her ability to attend and complete tasks, Ms. Rothman asserts that the only supporting evidence the ALJ cited was a lack of objective findings to support Dr. Moodley's

15

prescription for Adderall. (*Id.* at 937). She cites this as an example of the ALJ "picking and choosing" evidence to support his conclusion. (*Id.*).

Furthermore, Ms. Rothman contends that the ALJ's denial indicates objective findings are the only relevant evidence in evaluating the functional limitations set by severe mental impairments. (*Id.*). Citing *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989), Ms. Rothman argues that when mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. (*Id.*). In the ALJ's decision, the ALJ determined E.D.H.'s severe mental impairments included: generalized anxiety disorder; panic disorder; and persistent depressive disorder, with anxious distress. (*Id.* at 938 (citing Tr. 16)). Yet the ALJ rejected Dr. Moodley's opinion due to lack of objective evidence. (*Id.* (citing Tr. 24)). In focusing solely on objective evidence, Ms. Rothman contends, the ALJ ignored the following probative evidence tending to support Dr. Moodle's opinion that E.D.H. was markedly limited in the domain of completing and attending tasks:

- Ms. Rothman testified that E.D.H is very forgetful and will occasionally forget to turn off the stove, take medicine, login for schoolwork, or bring the dog inside. (Tr. 42-43).

- Ms. Rothman testified that E.D.H. has difficulty remembering and concentrating on her schoolwork. (Tr. 44-45).

- Ms. Rothman testified that E.D.H. had to repeat the eighth grade due to poor grades. (Tr. 48).

- E.D.H.'s May 2019 education records showed she had received D's in three of her classes. (Tr. 195).

- In October 2019, E.D.H reported to LPC Smith her depressive symptoms included depressed mood, suicidal ideation, lack of energy, lack of motivation, isolation, irritability, and uncontrollable crying. (Tr. 588). She also reported auditory hallucinations of hearing her name and visual hallucinations of seeing shadows. (*Id.*). She reported her anxiety symptoms included shortness of breath, racing heart,

chest tightness, sweaty palms, racing thoughts, and a feeling that "everyone is against me." (*Id.*). LPC Smith's examination showed E.D.H. had nervous and anxious behavior, depressed mood, passive suicidal thoughts and planning, and hallucinations. (Tr. 592).

- LPC Smith recommended a diagnosis of major depressive disorder, panic disorder, and agoraphobia. (Tr. 594).

- In February 2020, Dr. Mitra noted E.D.H.'s POTS symptoms included eye fog, random ringing in the ears, and frequent nausea. (Tr. 859). E.D.H. reported experiencing generalized anxiety nearly all day, social anxiety, and sadness when thinking about the past. (Tr. 860).

- Dr. Mitra's examination also showed E.D.H. had significant orthostatic tachycardia. (Tr. 861).

- Dr. Mitra prescribed E.D.H. Adderall XR for "brain fog." (Tr. 862).

Ms. Rothman contends that there is more record evidence "tending to support" a marked limitation in attending and completing tasks "than simply a prescription of Adderall." (ECF Doc. 10, PageID#939). Thus, she alleges that the ALJ erred in not finding Dr. Moodley's opinion more persuasive, and ultimately finding E.D.H. had a marked limitation in the domain of attending and completing tasks. (*Id.*).

In her reply brief, Ms. Rothman contends that many of E.D.H.'s limitations coincided with examples identified by the SSA as limitations in the domain of attending and completing tasks. (ECF Doc. 14, PageID#969) (quoting 20 C.F.R. § 416.926a(h)(3)). She cites the same symptoms and medical evidence she relied up on in her merits brief. (*See* ECF Doc. 10, PageID#938-39; ECF Doc. 14, PageID#970). Next, she contends that the Commissioner "repeated the ALJ'S mistake of focusing solely on objective evidence for the evaluation of a mental impairment." (ECF Doc. 14, PageID#970). Ms. Rothman asserts that a mental impairment necessitates some reliance on subjective reporting, as well as the observations made by mental health professionals. (*Id.*). Instead, Ms. Rothman argues, the ALJ relied on objective evidence to discount Dr. Moodley's

17

opinion, thereby failing to find E.D.H. had a marked limitation in attending and completing tasks. (*Id.* at 970-71). Finally, she contends that the Commissioner compounded this error by defending the ALJ's practice of picking and choosing objective evidence, while ignoring probative clinical observations and subjective findings. (*Id.* at 971).

### b.  The Commissioner's Arguments

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Dr. Moodley's opinion and finding of no limitation in attending and completing tasks. (ECF Doc. 13, PageID#954). The Commissioner asserts that Ms. Rothman has failed to demonstrate that the ALJ's discussion was inaccurate because she fails to point to any diagnoses of ADD/ADHD or abnormal examination findings regarding attention or concentration. (*Id.* at 956). Moreover, the Commissioner argues that, even if the ALJ had adopted Dr. Moodley's opinion that E.D.H. required extra time for assignments, this would not compel the ALJ to find a marked limitation in attending and completing tasks. (*Id.*)  That is because Dr. Moodley never stated E.D.H. was markedly limited, and Ms. Rothman cites no authority that requiring extended time necessitates a marked limitation. (*Id.*).

The Commissioner also argues that the ALJ's finding that E.D.H. had no limitation in attending and completing tasks was grounded in substantial evidence, pointing to E.D.H.'s normal examination findings regarding attention and concentration, her lack of a diagnosis regarding ADD/ADHD, the state agency psychological consultants' findings of no limitation, and Ms. Rothman's initial report that E.D.H. had no problems regarding her ability to pay attention and stick to a task. (*Id.* at 957 (citing Tr. 28, 58, 65, 162, 578, 579)).

Next, the Commissioner asserts that Ms. Rothman has not demonstrated any error in the ALJ's assessment of attending and completing tasks. (*Id.*). The Commissioner states that the ALJ

invoked the statements of multiple psychologists, as well as Ms. Rothman's own allegations, in reaching his conclusion. (*Id.*). The Commissioner argues Ms. Rothman is mistaken in her contention that observations of normal attention, concentration, or memory are irrelevant to assessing mental disorders. (*Id.*). The Commissioner contends that *Blankenship v. Bowen*, 874 F.2d 1116 (6th Cir. 1989), recognizes that when mental illness is the basis of a claim, the observation of professionals may be used as data. (*See id.* at 957-58). Further, the Commissioner also asserts that Ms. Rothman's reliance on *Blankenship* is unavailing because it "merely questioned whether 'mechanical devices' could verify mental impairments." (*Id.* at 958) (citing *Blankenship*, 874 F. 2d at 1121).

With respect to Ms. Rothman's "picking and choosing" contention, the Commissioner argues that the ALJ did in fact discuss the evidence that Ms. Rothman asserts the ALJ ignored. (*Id.* at 958). The Commissioner also notes that Ms. Rothman relies on symptoms that E.D.H. reported at her first counseling session in October 2019 and at another examination for POTS in February 2020, but she omits that there were no observations or mental status finding supporting attention or concentration problems at either of these appointments. (*Id.* (citing Tr. 593, 867)). Rather than showing error in the substantial evidence that the ALJ presented, the Commissioner maintains that Ms. Rothman "invites the Court to reweigh the medical evidence in a manner inconsistent with substantial evidence review." (*Id.*).

### 2. *Attending and Completing Tasks*

The domain of "attending and completing tasks" considers:

> …how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them.

20 C.F.R. §416.926a(h); SSR 09-4p. Under the Social Security Regulations, an adolescent should be able to pay attention to increasingly longer presentations and discussions, maintain concentration while reading textbooks, and independently plan and complete long-range academic projects. 20 C.F.R. 416.926a(h)(2)(v); SSR 09-4p. The adolescent should be able to organize her materials, and to plan her time in order to complete school tasks and assignments. *Id.* In anticipation of entering the workplace, she should be able to maintain attention on a task for extended periods of time, and not be unduly distracted by peers or unduly distracting to them in a school setting. *Id.*

Common examples of limited functioning in the attending and completing tasks domain are: (1) claimant is easily startled distracted, or overreactive to sounds, sights, movement, or touch; (2) claimant is slow to focus on, or fail to complete activities of interest to her, *e.g.*, games or art projects; (3) claimant repeatedly becomes sidetracked from her activities or she frequently interrupts others; (4) claimant is easily frustrated and gives up on tasks, including ones she is capable of completing; and (5) claimant requires extra supervision to keep her engage in an activity. 20 C.F.R. § 416.926a(h)(2)(i)-(iv). The degree of limitation depends on the totality of evidence in the record. 20 C.F.R. § 416.926a(h)(3).

### 3. *Dr. Moodley's Opinion*

Dr. Moodley opined that E.D.H.'s POTS symptoms were caused by an imbalance of the autonomic nervous system's control over blood flow. (Tr. 575). He explained symptoms of POTS may include "palpitations, fatigue, lightheadedness, exercise and temperature intolerance, nausea, headache, difficulty with concentration and focus, syncope and near syncope." (*Id.*). He further stated that these symptoms can be severe enough to affect daily functioning. (*Id.*). He continued to explain that the severity of the symptoms can vary day to day. (*Id.*). He stated that E.D.H. "***may***

20

*require* extended time for assignments related to the symptoms of difficult with concentration, focus and lightheadedness." (*Id.*) (emphasis added). He recommended that if E.D.H. experienced an episode, she should drink at least 500 milliliters of water and eat a salty snack. (*Id.*). He also indicated that E.D.H. should have access to the restroom as needed to compensate for increased water consumption, and should not participate in vigorous physical educational activities until she had been episode-free for at least three months. (*Id.*).

### 4. *The ALJ's Decision*

The ALJ stated the following on the persuasiveness of Dr. Moodley's opinion and E.D.H.'s "attending and completing tasks" domain:

> On September 10, 2019, Manikum Moodley, M.D., the claimant's pediatric neurologist, issued a narrative statement explaining the nature, symptoms and treatment of POTS, and providing directives in the event the claimant became lightheaded or fainted at school (3F). Dr. Moodley indicated the claimant may require extended time to complete assignments due to difficulty with concentration, focus and lightheadedness; needs restroom access due to increased water intake; and should not participate in vigorous physical activities until she has been episode-free for three months. However, the doctor noted that she is able to participate in light aerobic physical activity such as riding a stationary bicycle, walking, rowing and swimming with supervision. (*Id.*). This opinion is also partially persuasive. It is generally supported by and consistent with the claimant's neurology treatment records, discussed above. It supports a finding that the claimant is limited in the domains of acquiring and using information, due to the effects of her POTS symptoms on her ability to learn, as described by Dr. Moodley. The opinion further shows the claimant is limited in moving about and manipulating objects, and in health and physical well-being. However, the claimant is not shown to have difficulties with concentration or focus that significantly limit her ability to attend and complete tasks. As discussed above, although Dr. Moodley prescribed Adderall, this is not shown to have been based on any objective findings.
>
> …
>
> The claimant has no limitation in attending and completing tasks. Her mother initially reported that the claimant's ability to pay attention and stick to a task is not limited (3E/8). The claimant was subsequently prescribed Adderall, reportedly for concentration difficulties (9F, 10F), yet as discussed above, she has not been diagnosed with any type of attention deficit disorder, and no treatment provider or examining physician has observed objective signs of attention or concentration

problems. On the contrary, the claimant demonstrated good concentration and attention upon the consultative psychological examination (4F). The state agency psychological consultants determined that the claimant has no limitation in this domain (2A, 4A), and the undersigned does not find the subsequent evidence to show otherwise.

(Tr. 24-25, 28).

### 5. *Analysis*

The ALJ's determination that E.D.H. does not have a marked limitation in the domain of attending and completing tasks is supported by substantial evidence. Ms. Rothman relies on and quotes *Blankenship v. Bowen*, 874 F. 2d 1116 (6th Cir. 1989), to support her proposition that the ALJ's denial of Dr. Moodley's opinion "indicates objective findings are the only relevant evidence in evaluating the functional limitations set by severe impairments." (ECF Doc. 10, PageID#937). Mr. Rothman's reliance on *Blankenship* is unavailing. In *Blankenship*, the Sixth Circuit reversed and remanded where an ALJ erroneously disregarded a doctor's findings regarding the appellant's mental illness because the doctor examined the appellant on only one occasion and "there was not present a clear diagnostic picture." *Blankenship*, 874 F.2d at 1121. Upon review of the record, the Sixth Circuit determined that there was ***no*** medical evidence contradicting the doctor's conclusion. *Id.* The Sixth Circuit stated the following:

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices [*sic*] in order to obtain objective clinical manifestations of medical illness…[W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology.

*Id.* (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987) (further citation omitted)).

When mental illness is the basis of a disability claim, "clinical and laboratory data *may* consist of the *diagnosis and observations of professionals trained in the field of psychopathology*." *Id.* (emphasis added). Here, the ALJ relied on the observations of professionals in reaching his conclusion that E.D.H. did not have a marked limitation in the attending and completing tasks

domain. Specifically, the ALJ pointed to normal examination findings regarding E.D.H.'s attention and concentration, and her lack of diagnosis for either ADD or ADHD. (Tr. 28). Further, the ALJ discussed how the state agency consultants also determined that E.D.H. had no limitations in this domain. (Tr. 28, 58, 65). In reaching this conclusion, the state agency psychologists relied on Dr. Thomas Evans's consultative examination and opinion. (Tr. 60). Dr. Evans stated that E.D.H. maintained "good attention and focus" throughout the entire evaluation. (Tr. 578). Dr. Evans also noted that E.D.H.'s attending and completing tasks domain was normal compared to the attending and completing tasks domain of typically-developing children of the same age. (Tr. 58, 579). Finally, although not the observation of a professional trained in the field of psychopathology, the ALJ noted that Ms. Rothman's initial report stated that E.D.H. had no problems in her ability to pay attention and stick to a task. (Tr. 28, 162).

Ms. Rothman's contention that the ALJ "ignored probative evidence tending to support Dr. Moodley's opinion" (*e.g.*, "picking and choosing") is also not well-taken. Reading the ALJ's decision as a whole, most of Ms. Rothman's cited evidence was discussed earlier in the opinion. *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-69 (7th Cir. 2010). Significantly, the ALJ noted Ms. Rothman's testimony that E.D.H. is forgetful regarding her medications, homework, and taking care of their dogs. (Tr. 21, 42-43, 44-45, 48). He also addressed that E.D.H. received D grades during the 2019 school year and repeated the eighth grade. (Tr. 21, 195). The ALJ also discussed the symptoms E.D.H. reported at her October 2019 counseling session (Tr. 23, 588) and the February 2020 findings that E.D.H. had significant orthostatic tachycardia (Tr. 23, 861). In addition, the ALJ discussed LPC Smith's October 2019 examination that showed E.D.H had nervous and anxious behavior, depressed mood, passive suicidal thoughts and planning, and hallucinations, and noted that LPC Smith recommended a diagnosis of major depressive disorder,

panic disorder, and agoraphobia. (Tr. 23, 592, 594). The ALJ also noted that in February 2020, E.D.H. had been prescribed Adderall for "brain fog." (Tr. 23, 862).

It appears that the only evidence that the ALJ did not discuss was Dr. Mitra's note in February 2020 where the doctor noted E.D.H.'s POTS symptoms included eye fog, random ringing in the ears, and frequent nausea (Tr. 859), and E.D.H.'s report that she experienced generalized anxiety nearly all day, social anxiety, and sadness when thinking about the past (Tr. 860). To the extent that the ALJ failed to cite this evidence, the Sixth Circuit has recognized that an ALJ is not required to specifically discuss every piece of evidence in order to render a decision supported by substantial evidence. *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08) (6th Cir. 2006)).

Although Ms. Rothman points to symptoms and medical evidence that she alleges are "highly suggestive of marked limitation in attending and completing tasks" (ECF Doc. 14, PageID#970), the ALJ presented substantial evidence in support of his conclusion that E.D.H. did not have a marked limitation in this regard. Specifically, the ALJ pointed to the lack of objective findings supporting that E.D.H. had been diagnosed with an attention deficit disorder, plus Ms. Rothman's subjective reports that E.D.H. did not struggle with remaining on task. (Tr. 28). The ALJ also pointed to the fact that the state agency psychologists also determined that E.D.H. did not have a marked limitation in the attending and completing tasks domain. (*Id.*).

And while Ms. Rothman cites to reported symptoms and medical evidence that may support a different conclusion, she fails to establish how the ALJ's conclusion was in error. For example, she relies on E.D.H.'s symptoms at her October 2019 counseling session and February 2020 POTS examination, but none of those appointments revealed any findings indicating that E.D.H. had attention or concentration issues.  (Tr. 593, 861). Moreover, as noted by the

Commissioner, failing grades and the need for extended time for assignments do not necessarily compel the ALJ to reach the conclusion that a child claimant has a marked limitation in attending and completing tasks. *See, e.g.*, *Betty o/b/o M.A.T.B. v. Comm'r of Soc. Sec.*, No. 19-10922, 2019 WL 2051900, at *3 (E.D. Mich. Mar. 13, 2019); *Roosa v. Comm'r of Soc. Sec.*, No. 5:12cv2556, 2013 WL 6243709, at *6 (N.D. Ohio Dec. 3, 2013).

In sum, the relevant question is not whether there is evidence to support a ruling different than that reached by the ALJ. *Lebro ex rel. R.L. v. Comm'r*, No. 1:13CV1355, 2014 WL 3749221, at *11 (N.D. Ohio July 29, 2014). The Commissioner's determination must stand if supported by substantial evidence, regardless of whether some evidence might support another conclusion. *Kidd v. Comm'r*, No. 99-6481, 2001 WL 345787, at *3 (6th Cir. Mar. 27, 2001). Here, the ALJ's decision demonstrates that the ALJ considered the record evidence and explained the rationale for his decision concerning E.D.H.'s attending and completing tasks domain. (Tr. 28). Ms. Rothman's argument that the ALJ erred in concluding that E.D.H. has no limitation in that domain is without merit. Accordingly, I recommend that the Court reject Ms. Rothman's of error.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court OVERRULE Ms. Rothman's assignment of error and AFFIRM the Commissioner's decision.

## VII.    NOTICE TO THE PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.** Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the

basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

Dated: February 7, 2023

      *s/ Jennifer Dowdell Armstrong*
      Jennifer Dowdell Armstrong
      United States Magistrate Judge